760 So.2d 18 (1999)
Stephen BRASINGTON a/k/a Stephen H. Brasington, Jr., Appellant,
v.
STATE of Mississippi, Appellee.
No. 96-KA-01132-COA.
Court of Appeals of Mississippi.
October 12, 1999.
Rehearing Denied January 11, 2000.
*19 William Ross Capps, Albert Lionel Necaise, Gulfport, Attorneys for Appellant.
Office of the Attorney General by Jeffrey Klingfuss, Attorney for Appellee.
BEFORE KING, P.J., IRVING, AND LEE, JJ.
LEE, J., for the Court:
¶ 1. After a previous indictment for the subject incident that occurred on October 16, 1994 had been nol prossed, a Jackson County grand jury indicted Stephen Brasington for Count I, burglary of an inhabited dwelling; Count II, armed robbery; and Count III, kidnaping, on October 6, 1995. Count I was reduced to burglary of a dwelling, and Brasington entered guilty pleas to these charges on January 30, 1996, in Jackson County Circuit Court. Subsequently, Brasington filed a motion to withdraw his guilty plea which was overruled by the circuit court. Brasington appeals that court's denial of his motion to withdraw his pleas and presents three issues, which we quote verbatim, for review: (1) whether the guilty plea of Stephen Brasington was involuntary, (2) whether the portion of the indictment charging Stephen Brasington as a habitual offender is fatally defective, (3) whether the district attorney violated the terms of the plea by making a recommendation that Stephen Brasington be sentenced to one year less than his natural life. We affirm the decision of the circuit court.

I. FACTS
¶ 2. Stephen Brasington was arrested in Louisiana in December of 1994 and extradited to Jackson County, Mississippi on December 29, 1994. After officers advised him of his rights, Brasington admitted that he had perpetrated the crimes with which he was charged in this case. He related that he broke into Christina Abbot's house and held Ms. Abbot and her two children at gunpoint when they arrived. He closed them in a closet and drove away in Ms. Abbot's automobile. His confession was recorded on videotape, and Ms. Abbot identified Brasington from a photographic lineup.
¶ 3. Brasington was initially indicted for armed robbery. Mr. Brice Kerr was counsel for Brasington prior to and during his guilty plea hearing. Once Mr. Kerr became counsel for Brasington, plea negotiations *20 ensued between the State and Mr. Kerr.
¶ 4. The district attorney offered a plea bargain which would require Brasington to serve twenty years in the custody of the Mississippi Department of Corrections (MDOC). The district attorney informed Mr. Kerr that if the plea offer was not accepted by Brasington he would re-indict him as a habitual offender, and add the additional charge of burglary of an inhabited dwelling pursuant to Mississippi Code Section 97-17-21. Brasington refused the plea offer. After the initial indictment was nol prossed, the grand jury indicted Brasington for burglary of an inhabited dwelling, armed robbery, and kidnaping as a habitual offender. The trial was set for January 30, 1996.
¶ 5. In the interim, due to the possible maximum sentence Brasington could receive if a jury found him guilty, Mr. Kerr, counsel for Brasington, advised him not to pursue a trial and encouraged Brasington's mother and sister to convince Brasington to plead guilty. Brasington did enter a plea of guilty to the charges.
¶ 6. Subsequently, Brasington filed a motion pro se to withdraw his guilty plea. He asserted that Mr. Kerr was incapable, uncooperative, and dishonest in coercing him to plead guilty; that the judge intended to require him to go to trial on the day he pleaded even if he had no lawyer; that he did not know his trial date and believed he was going to court only to fire his attorney; and that he would have "suffered extreme prejudice and possibly severe punishment in asserting [his] rights." Brasington insisted that these conditions resulted in his involuntary guilty plea.

II. HEARINGS

A. Motion to Withdraw Guilty Plea Entered January 30, 1996
¶ 7. On August 30, 1996, Brasington appeared for the above referenced hearing with new counsel. At this hearing, Brasington called the following individuals in an attempt to substantiate his claim that his pleas were involuntary: (1) District Attorney Dale Harkey, (2) Brasington's sister, Teresa Special, (3) his mother, Elizabeth Brasington, and (4) himself.
¶ 8. Brasington's first witness was the district attorney, Dale Harkey. Mr. Harkey testified that a plea bargain was offered to Brasington. The written offer included an explanation that, if Brasington did not accept it, the district attorney would re-indict Brasington as a habitual offender with "more thorough" charges that were overlooked in the first indictment. Mr. Harkey also cited authority allowing for prosecutorial discretion in plea bargaining.
¶ 9. Teresa Special, Brasington's sister, testified that Mr. Kerr told her and her mother that they needed to convince Brasington to plead guilty. She said that she and her mother tried to find another lawyer for her brother, and she detailed the conversations between Brasington and his family. Special asserted that Mr. Kerr mentioned plea bargaining only one time, early in the representation.
¶ 10. After affirming that Brasington did not want to go to court without a lawyer, Special testified that she and her mother "convinced him to plead guilty, but he did not want to." She alleged that Mr. Kerr threw papers on the table and told Brasington that he had to sign them, without explaining anything. She also recalled that, when the judge asked if he was happy with his representation, he shook his head and finally said, "I guess so."
¶ 11. On cross-examination, Special testified that Brasington indicated to her that his defense was that he was not guilty of forcibly kidnaping anyone. She also asserted that he only confessed to the crimes under duress.
¶ 12. Brasington's mother, Elizabeth Brasington, testified that Mr. Kerr told her that her son would be sentenced to life in prison if he went to trial. She said that the district attorney told her that there *21 would be no "deal," and she noted that Brasington was surprised to see his family in the courthouse that morning. Mrs. Brasington corroborated Mrs. Special's testimony that Brasington was forced to sign papers without any explanation, that he looked haggard and hopeless, and that he paused before responding, "I guess," when asked whether he was satisfied with his attorney. She acknowledged that she never threatened her son to make him plead guilty, that she never heard Mr. Kerr, the district attorney's office, or the court threaten her son, and that she never heard her son speak of any threats.
¶ 13. Finally, Stephen Brasington testified. He described being arrested in Louisiana while he was riding with a co-worker in a stolen vehicle. He signed extradition papers to return to Pascagoula, Mississippi. Brasington alleged that Mr. Kerr very rarely came to the jail to discuss his case and that he would not come to the jail at all unless a court hearing was eminent. He testified that Mr. Kerr had informed him that there was a plea offer of fifteen years mandatory imprisonment; however, he had not seen any offer in writing. He told Mr. Kerr that he would not plead guilty to any violent crime and that he had an alibi because he was in Georgia on October 16. Brasington claimed that Mr. Kerr only spoke to him about the plea offer one time. He then said that Mr. Kerr spoke to him about the offer a few days later and instructed him that, if he did not plead guilty to the charges in the first indictment, he would be re-indicted as a habitual offender with additional charges including kidnaping.
¶ 14. Brasington testified that Mr. Kerr led him to believe that the district attorney was just using his threats of a new indictment in order to get him to plead guilty. Brasington further claimed that Mr. Kerr would not discuss his case with him, would not pursue his alibi defense, and would not instigate an internal affairs investigation of the police officers Brasington claims perjured themselves in a suppression hearing. He said that Mr. Kerr prevented him from being present at hearings and refused to file motions for a lineup so that the victim would have to identify him again. According to Brasington, Mr. Kerr prohibited him from testifying. Brasington claimed that he lost all faith in Mr. Kerr's abilities when Mr. Kerr told the court that Brasington was guilty.
¶ 15. Brasington further testified that on January 29, 1996, one day before the scheduled trial, he had told Mr. Kerr that he wanted a new attorney. Brasington said that Mr. Kerr met with the judge and was told Brasington would go to trial the next day, with or without an attorney. Disregarding that information, Brasington said that he was surprised to see his family in the courtroom because he thought that he was just going before the judge to explain that he wanted a new lawyer. He said that no preparations had been made for trial, no witnesses were there, and he was not dressed for trial. He claimed, "I was just totally unprepared. I had no idea that I was fixing to go to trial at that time." However, he also admitted that he knew it was "supposedly" the date for trial. Brasington acknowledged that he told the judge that he was satisfied with his attorney. He noted that he did not want to represent himself and that he was forced to enter a guilty plea to avoid going to trial without a lawyer. In response to questions by the prosecutor, Brasington testified that he had pled guilty to other crimes in other courts.
¶ 16. Brasington testified that he had informed only Mr. Kerr that he wanted to fire him, and he reasoned that Mr. Kerr was court-appointed so he could not fire him. Brasington contradicted his mother's and his sister's testimony by acknowledging that Mr. Kerr did discuss the plea petition as he filled in the blanks. He said that he never read the petition, but he acknowledged that he responded to the judge's inquiry that nobody threatened him in order to make him plead guilty. He could not remember what he told the *22 judge when she asked what he did that made him feel that he was guilty of this crime. Brasington claimed, "I had to go along." He agreed with the prosecutor's declaration that "the entire plea hearing was a lie, basically[.]"
¶ 17. Following Brasington's testimony at the hearing, his attorney addressed the court with questions about whether Mr. Kerr had informed the trial judge that Mr. Brasington wanted a new attorney. Although the State suggested that asking the court to testify was improper, the judge detailed what she remembered of her discussion with Mr. Kerr about his client wanting to fire him. She said that she told Mr. Kerr that, because he was retained counsel, Brasington could hire anyone he wanted to hire, but that she would not release Mr. Kerr until another lawyer was retained unless Brasington wanted to represent himself, and that she intended to proceed with Brasington's trial the next day.
¶ 18. The State called Brasington's former attorney, Brice Kerr, who detailed his representation of Brasington from the time that he was appointed until the hearing sub judice. He said that the jail docket showed that he had been out to the jail more than twenty times to see Brasington in addition to meeting with him at numerous hearings. He described the defenses that he discussed with Brasington, including his filing a notice of alibi, but he stated that Brasington never offered sufficient information to pursue the alibi defense fully. Kerr denied threatening Brasington and explained that he "tried to tell him what the law was," stressing the fact that Brasington could spend the remainder of his life in jail without parole if a jury returned a guilty verdict.
¶ 19. Mr. Kerr reviewed the petition to plead guilty and clarified that he completed it as he asked Brasington the printed questions. He noted that Brasington seemed offended and that Brasington said that he had "been through this before." Mr. Kerr stated that he instructed Brasington that, if he was dissatisfied with the services of his attorney, he should advise him at that time while they were completing the petition, but Brasington never expressed that he wanted the petition to reflect dissatisfaction. Mr. Kerr specified that Brasington signed the plea petition in his presence.
¶ 20. Mr. Kerr said that Brasington, his mother, and sister understood that he could not reasonably go to trial. The plan was to continue to negotiate with the district attorney and, if necessary, to request a sentencing hearing to show mitigating circumstances. Neither Mr. Kerr nor Brasington were satisfied with the plea recommendation, and they discussed it almost every time they met, but the district attorney said that Brasington would be prosecuted at trial if he did not plead guilty. Even when the district attorney said that he would re-indict Brasington on additional terms, Brasington remained adamant that he did not wish to enter a plea agreement.
¶ 21. After the second indictment, plea negotiations continued. Although Brasington did not want to plead guilty, Mr. Kerr said that Brasington and his family understood that he could not go to trial on a kidnaping charge because he could receive a life sentence as a habitual offender. Mr. Kerr said that Brasington never adamantly demanded to go to trial; instead, Brasington continued to ask about what the judge would do and whether the district attorney would consider a lower recommendation. Mr. Kerr instructed Brasington of the maximum and minimum sentences if Brasington entered a guilty plea. Mr. Kerr said that Brasington did not specifically disagree when he suggested that Brasington's testifying at the suppression hearing would serve no purpose.
¶ 22. According to Mr. Kerr, Brasington informed him on the afternoon before the trial date that he did not want to enter a plea. Mr. Kerr acknowledged that he did not raise, in the record, Brasington's wish *23 to fire his attorney. He discussed his calling Brasington's family and informing them that Brasington needed to be convinced to follow the original plan and plead guilty. He noted that the day before the plea was not the only time that Brasington had become unhappy with his representation, and he mentioned that Brasington had previously indicated his unhappiness and then immediately changed his mind. Mr. Kerr also remarked:
I am telling you that he and his family and I discussed, from the time I was hired privately, after he got indicted as an habitual offender, that the basis on which I quoted him a fee was with the understanding that in my opinion he could not go to trial on these charges because he would risk going to the penitentiary for the rest of his life without the possibility of parole; that he could not risk that and we were going to try to get the recommendation down. And we were going to try to see if we could get some good mitigating circumstances, of which I thought there were a number.
Mr. Kerr observed that Brasington did not seem easily dominated or influenced.
¶ 23. Following closing arguments, the court reviewed the file for the record and denied Brasington's motion to withdraw his plea. The court also agreed to the State's request that Brasington be bound over to await an indictment on perjury, based upon Brasington's conflicting testimony.

B. Sentencing Hearing
¶ 24. At the sentencing hearing Brasington detailed the circumstances which led to the divorce between himself and his wife, and his subsequent relocation from Georgia to Mississippi. He described the ways that he survived as a homeless person with no food or money. Brasington also described the incident for which he is charged in this case, explaining that he was hungry and "just wanted to get something to eat" when he broke into the house. In narrating the incident, Brasington failed to mention that he pointed a gun at his victims, but he expressed sorrow for his actions and for his victims.
¶ 25. On cross-examination, Brasington agreed that his testimony was very similar to the videotaped confession. He acknowledged that Mr. Kerr did not threaten him. He admitted that he did not actually have an alibi for the date the crime occurred and explained that his alibi was based upon an error as to the date in the indictment.
¶ 26. The circuit judge asked the district attorney if he had a recommendation, noting that the plea transcript reflected his request that the court allow him to make a recommendation at sentencing. The district attorney explained that the State would have recommended fifteen years, without parole, if Brasington had been truthful and not tried to withdraw his plea. However, having listened to Brasington in both hearings, the prosecutor recommended that Brasington be sentenced to a term of one year less than his natural life, without parole.
¶ 27. After Brasington addressed the court, the judge observed that Brasington already had seven felonies on his record including two burglaries and that his testimony conflicted in that he claimed he had an alibi and then admitted that he had committed the crimes. The judge elaborated, "I have been in and out of courts in this county for twenty years, and I've never seen anybody blatantly commit perjury like you have today and then stand up and ask the Court to give you leniency." The court sentenced Brasington to serve ten years in the MDOC for burglary of a dwelling, eighteen years for armed robbery, and eighteen years for kidnaping, with these sentences to run concurrently, and with no possibility of parole, probation, or early release.

III. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

A. Brasington's first issueWas his guilty plea involuntary?

*24 1. Standard of Review

¶ 28. Rule 8.04 of the Uniform Circuit and County Court Rules includes the following explanation of the requirement that a guilty plea must be voluntary:
3. Voluntariness. Before the trial court may accept a plea of guilty, the court must determine that the plea is voluntarily and intelligently made and that there is a factual basis for the plea. A plea of guilty is not voluntary if induced by fear, violence, deception, or improper inducements. A showing that the plea of guilty was voluntarily and intelligently made must appear in the record.
Rule 8.04 URCCC. Rule 8.04 URCCC also provides that permission or denial of the withdrawal of a guilty plea is within the trial court's discretion.
¶ 29. The supreme court offered the following guidance in addressing the constitutional standards for a guilty plea:
In order to meet constitutional standards, a guilty plea must be freely and voluntarily entered. It is essential that an accused have knowledge of the critical elements of the charge against him, that he fully understand the charge, how it involves him, the effects of a guilty plea to the charge, and what might happen to him in the sentencing phase as a result of having entered the plea of guilty. Henderson v. Morgan, 426 U.S. 637[, 96 S.Ct. 2253, 49 L.Ed.2d 108] (1976).
Smith v. State, 636 So.2d 1220, 1225 (Miss. 1994) (quoting Gilliard v. State, 462 So.2d 710, 712 (Miss.1985); see also Schmitt v. State, 560 So.2d 148, 153 (Miss.1990)).

2. Analysis
¶ 30. The court complied with Rule 8.04 URCCC by informing Brasington of his rights. The record reveals that at the plea hearing the circuit judge individually addressed Brasington relative to his background information, his understanding of the indictment, verification of his former convictions, and his understanding of the maximum and minimum sentences that might be imposed for the crimes stated in the indictment. The record further reveals that there were other defendants before the court entering pleas of guilty before the trial judge, and all the defendants, including Brasington, were addressed as a group relative to whether they had been promised anything or threatened into pleading guilty, and if they were satisfied with the services of their counsel. Nevertheless, while looking at the record as a whole and the totality of the circumstances, this Court determines that Brasington was aware of his rights.
¶ 31. Brasington responded that he understood the rights he was waiving, that he was not threatened or promised anything in order to make him plead guilty, and that he was fully satisfied with the services of his attorney. The trial court concluded that Brasington's guilty pleas were "freely and voluntarily given, with a full understanding of [his] constitutional rights and the consequences of these guilty pleas." It is apparent that Brasington is no stranger to the criminal system and the record reveals several contradictions in Brasington's assertions made to the trial judge. If Brasington was dissatisfied with the representation of his counsel, the guilty plea hearing would have been his opportunity to express his dissatisfaction prior to entering his guilty plea.
¶ 32. The Mississippi Supreme Court, in Baker v. State, elaborated on the implied verity of statements under oath:
We are mindful, as stated in Blackledge v. Allison [431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)], that "Solemn declarations in open court carry a strong presumption of verity." The State, the defendant, and the judicial system all have a significant interest in the plea. For the defendant, if guilty, he can begin serving his sentence without facing the delay and agony of a futile trial. Time is conserved for the state prosecutor[,] and an already crowded court system *25 is spared an unnecessary burden. Balanced against these administrative interests of course is the interest of protecting constitutional rights, particularly in the criminal law area.
Baker v. State, 358 So.2d 401, 403 (Miss. 1978). Accordingly, the trial court should place great emphasis upon statements made under oath in open court during plea proceedings and sentencing. Brasington's statements at his plea entry hearing, the hearing on his motion to set aside his guilty plea, and his sentencing hearing are contradictory. The trial judge's decision to place greater emphasis upon the responses and statements in the hearing at which he entered his guilty plea is not inappropriate. Brasington indicated no fear, violence, deception, or improper inducements in his testimony at his plea hearing. At his motion to set aside the plea, Brasington's testimony about what induced him to plead guilty involuntarily is contradicted by other witnesses and by his own testimony at the plea hearing and at the sentencing hearing.
¶ 33. Brasington asserts that the district attorney's threats, the judge's refusal to specifically inquire about his complaints about his legal counsel, and Mr. Kerr's using every means to persuade Brasington to plead guilty and avoid trial evoked his involuntary plea.
¶ 34. As stated, Brasington was initially indicted only for armed robbery. He was told by the prosecutor unless he pleaded guilty to armed robbery and accepted a twenty-year sentence the prosecutor would re-indict him as a habitual offender and charge him with burglary of an inhabited dwelling. Brasington refused to plead guilty to the charge, and the prosecutor made good on his word, re-indicting Brasington and charging him with armed robbery, burglary of an inhabited dwelling, and kidnaping as a habitual offender.
¶ 35. Brasington pled guilty to the second indictment, but claims prosecutorial misconduct in conjunction with the first indictment as being a contributing factor to his involuntary decision to plead guilty to the second indictment. We fail to see the logic. Clearly, if the threat of reindictment charging Brasington with additional offenses as a habitual offender was not sufficient to force him to plead guilty to the initial indictment, re-indicting him and charging him with additional offenses as a habitual offender would be neither a factor nor an incentive sufficient to force an involuntary guilty plea to the new indictment. We note that Brasington specifically says he in not claiming a due process violation regarding the prosecutor's misconduct.
¶ 36. In State v. Pittman, the court discussed Rule 3.03(B) and (C) of the former Uniform Criminal Rule of Circuit Practice, which now exist as Rule 8.04(A)(3) & (4), URCCC:
Clearly, the trial judge who accepted the guilty plea complied with the rule, and there was no deficiency in his inquiry. He had over six pages of questions in the record, and the defendant was represented and advised by his attorney. Where, as here, it is clear from the record that the defendant was fully advised of all elements of [former] Rule 3.03(4) via a signed petition, and the judge discussed with the defendant his understanding of the petition, this Court will not allow a guilty plea to be set aside for noncompliance with Rule 3.03. This Court has held that the trial court's failure to comply with Rule 3.03 can be found harmless error, at least to the extent that the noncompliance pertains to the trial court's informing the defendant of the maximum and minimum sentences, if the defendant was correctly informed by another source or if it appears beyond a reasonable doubt that the plea would have been entered anyway. Gibson v. State, 641 So.2d 1163, 1166 (Miss.1994) (citing Smith v. State, 636 So.2d 1220 (Miss.1994); Sykes v. State, 624 So.2d 500 (Miss.1993); Gaskin v. State, 618 So.2d 103, 108 (Miss.1993)). *26 State v. Pittman, 671 So.2d 62, 64-65 (Miss.1996). Similarly, the trial judge questioned Brasington extensively, with seventeen pages of advice and questions in the record. The judge asked questions specifically devised to determine whether Brasington's plea was made voluntarily and intelligently or whether the plea resulted from fear, violence, deception, or improper inducements. Furthermore, Brasington signed the plea petition which advised him of his rights and required responses necessary to determine whether his plea was voluntary. His signature stipulated that his responses were true and correct.
¶ 37. The trial judge in the case sub judice made the following observations:
This Court takes great pains in going over that plea petition with every defendant that stands in front of me to make sure they understand what they're doing and what rights they are waiving by pleading guilty. That pleathis transcript that I've had marked for this hearingclearly shows that I did that with Mr. Brasington. I gave him every opportunity.
Furthermore, all of Brasington's responses indicate that his guilty plea was voluntary.
¶ 38. In regard to Brasington's impression that Mr. Kerr wrongly persuaded him to plead guilty, we find no suggestion that Mr. Kerr threatened Brasington or provided improper inducements. Mr. Kerr gave Brasington sound advice, which, had Brasington followed it, might have resulted in a shorter sentence. A lawyer's "persuading" a defendant to plead guilty by "every means at his disposal" does not render the plea involuntary if that persuasion does not result from fear, violence, deception, or improper inducements. The trial judge provided the following insight:
I have not heard anything this morning or this afternoon that would convince me or even indicate in any way that Mr. Brasington was forced or coerced or anything else into pleading guilty. Now, if your position is that people talking him into it, his mother, his sister talking him into that this is the best thing for him, is coercion, then just about every guilty plea we take around here may be coerced, because people do talk to them and try to explain to them the risk of trial as opposed to pleading guilty...:
As the trial judge explained, persuading a defendant that it is in his best interest to plead guilty is not coercion sufficient to render a guilty plea involuntary.
¶ 39. We affirm the circuit court's ruling that Brasington's guilty plea was voluntary.

B. Brasington's second issue: Is the "habitual offender" section of the indictment fatally defective?
¶ 40. As the State observes, Brasington never claimed that the indictment was defective at the trial level. The trial court cannot now be held in error on a legal point never presented to it for consideration. Chase v. State, 645 So.2d 829, 846 (Miss.1994).
¶ 41. The supreme court, in Crawford v. State, explained the necessity of addressing the indictment at the trial level:
The issue of a faulty indictment was first mentioned on appeal to this Court. The deficiency appearing in the indictment complained about by Crawford is non-jurisdictional, and may not be raised for the very first time on direct appeal absent "... a showing of cause and actual prejudice." Brooks v. State, 573 So.2d 1350, 1353 (Miss.1990). See Miss.Code Ann. § 99-39-21(1) (1994).
Crawford v. State, 716 So.2d 1028, 1050-51 (Miss.1998). Similarly, the supreme court has determined that, pursuant to Miss. Code Ann. Section 99-7-21 (Rev.1994), "defects on the face of an indictment must be presented by way of demurrer." Brandau v. State, 662 So.2d 1051, 1054 (Miss. 1995); see Gray v. State, 728 So.2d 36 (¶ 169) (Miss.1998). In regard to this particular type of defect, the court recently held that an appellant waived his right to *27 argue about the habitual offender section of an indictment following the words of conclusion when the appellant entered his valid guilty plea. Foster v. State, 716 So.2d 538 (¶ 5) (Miss.1998); Brandau v. State, 662 So.2d 1051, 1054 (Miss.1995); Miss.Code Ann. § 99-7-21 (Rev.1994); see Gray v. State, 728 So.2d 36 (¶ 169) (Miss. 1998).
¶ 42. The assertion that the indictment was fatally defective is untimely and unsupported by Mississippi case law. Therefore, we decide this issue adversely to Brasington.

C. Brasington's third issue: Did the district attorney's recommendation violate a plea bargain agreement with Brasington?
¶ 43. According to the record, Brasington never agreed to any plea bargain offered by the State, and his plea petition indicates that the plea was "open." This open plea petition did not designate any specific recommendation that the State would offer. Therefore, the State was not bound by any agreement to offer a specific recommendation. Although Brasington's lawyer stated for the record that he disagreed with the terms of the State's recommendation, he never objected to the fact that the State made a recommendation. Therefore, the trial court never had the opportunity to rule on this issue. Chase v. State, 645 So.2d 829, 846 (Miss.1994).
¶ 44. We observe that Brasington cites no authority requiring that the State not offer a recommendation on an open plea. This Court is not required to address issues for which the party provides no pertinent authority. Williams v. State, 708 So.2d 1358 (¶ 12) (Miss.1998); Grey v. Grey, 638 So.2d 488, 491 (Miss.1994); McClain v. State, 625 So.2d 774, 781 (Miss. 1993); Smith v. Dorsey, 599 So.2d 529, 532 (Miss.1992). The authority which Brasington cites on appeal applies only to defendants who enter a plea agreement with the State. He never suggested that he entered an agreement until he addressed this issue on appeal. Recognizing that the trial court was not obligated to accept the State's recommendation, we will not deny the State an opportunity to recommend a sentence. We also observe that the trial court did not sentence Brasington precisely according to the recommendation.
¶ 45. We discern no hint that the State violated the terms of a plea agreement as we find that Brasington failed to prove that an agreement existed. Therefore, we affirm as to this issue.

IV. CONCLUSION
¶ 46. We discern that the evidence does not reflect any threat or coercion by prosecutors, police officers, Brasington's lawyer, or his family. Consequently, we find that Brasington pled guilty voluntarily. Based upon our review of recent Mississippi case law, we ascertain no fatal defect in the indictment, and we recognize that this assignment of error was not timely raised. In regard to Brasington's third issue, we note that his suggestion that a plea agreement existed is unsupported by the evidence. Therefore, we affirm the circuit court's findings and sentence.
¶ 47. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY OF CONVICTION OF COUNT I BURGLARY OF A DWELLING AND SENTENCE OF TEN YEARS; COUNT II ARMED ROBBERY AND SENTENCE OF EIGHTEEN YEARS; AND COUNT III KIDNAPING AND SENTENCE OF EIGHTEEN YEARS, WITH SAID SENTENCES TO RUN CONCURRENTLY AND WITHOUT BENEFIT OF PAROLE, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.